1
2
3
4
5
6
7
8
9
10

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20
21

| | |
|---|---|
| FOOTHILLS CHRISTIAN CHURCH; THE GROVE CHURCH; and SAN DIEGO JOURNEY COMMUNITY CHURCH, | Case No. 22-cv-0950-BAS-DLL |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE** |
| v. | **(ECF No. 13)** |
| KIM JOHNSON, in her official capacity as the Director of the California Department of Social Services; and ROBERT ANDRES BONTA, in his official capacity as the Attorney General of the State of California, | |
| Defendants. | |

22
23
24
25
26
27
28

The California Child Day Care Facilities Act (the "Act"), Cal. Health & Safety Code § 1596.70 *et seq.*, enables private persons, firms, associations, partnerships, and corporations to open and operate preschools in California, so long as they attain a license to do so first. To this end, the Act establishes a comprehensive licensing scheme, regulated, overseen, and monitored by the California Department of Social Services ("DSS"). The Act, and the DSS regulations and rules promulgated thereunder, enumerate requirements and set benchmarks concerning health and safety, with which applicants must

verify to the DSS they can comply.  The DSS both assesses whether applicants qualify for licenses and monitors licensees' continued compliance to determine whether they remain in good standing.  The DSS may levy fines against, suspend and/or revoke the licenses of, and enjoin violations committed by unlicensed and licensed, but noncompliant, child day care facilities.  The Act also makes "willful" or "repeated" violations a misdemeanor offense.

Plaintiffs The Grove Church ("Grove"), San Diego Journey Community Church ("Journey"), and Foothills Christian Church ("Foothills," together with Grove and Journey, "Plaintiffs") are churches located in San Diego County that maintain active child ministries.  (*See generally* Compl., ECF No. 1.)  As extensions to those ministries, Plaintiffs seek to open or reopen preschools.  But Plaintiffs wish to operate preschools outside the confines of the Act, and they bring the instant lawsuit to strike down as unconstitutional the Act and its implementing regulations in their entirety.

This case principally sounds in the Free Exercise Clause of the First Amendment. Plaintiffs claim the Act interferes with their religious conviction:  to administer to the enrollees of their preschools a curriculum in which attendance at religious events and participation in religious activities is mandatory.  But Plaintiffs also assert a novel legal theory that the Act violates the Privileges or Immunities Clause of the Fourteenth Amendment because it conditions licensure upon waiver of several constitutional rights. Plaintiffs seek injunctive and declaratory relief invalidating the Act, thereby permitting them to open and operate parochial preschools without licensure.

Defendants Kim Johnson, Director of the DSS, and Robert Bonta, the Attorney General of the State of California, now move to dismiss the Complaint pursuant to both Federal Rule of Civil Procedure ("Rule") 12(b)(1) and Rule 12(b)(6). (Mot., ECF No. 13.) Defendants also request judicial notice of certain information and materials in connection with the strand of their Motion that is directed towards Plaintiffs' Free Exercise Claim.

22cv0950

(Req. for Judicial Not. ("RJN"), ECF No. 14.)  Plaintiffs oppose the Motion (Opp'n, ECF No. 15) and Defendants reply (Reply, ECF No. 17).[1]

The Court finds the Motion suitable for determination on the papers submitted and without oral argument.  *See* Fed. R. Civ. P. 78(b); Civ. L. R. 7.1(d)(1).  For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Request for Judicial Notice (ECF No. 14), **GRANTS** the Motion (ECF No. 13), and **DISMISSES WITHOUT PREJUDICE** and **WITH LEAVE TO AMEND** the instant action.

## I.    BACKGROUND

### A.    The California Child Day Care Facilities Act

Plaintiffs label California a "newcomer" with respect to the provision of social services catering to children, including child day care and other similar caretaking and educational programs. (Compl. ¶ 71.)  But California has been exercising its police powers to regulate the health and safety of child care facilities in one form or another since 1913.[2]  *See* 1913 Cal. Stat. 73, 73–74 (promulgating licensing scheme for maternity hospitals, asylums, boarding houses, and, most relevant here, "homes for the reception of children"); *see also* 1937 Cal. Stat. 1005, 1076–78 (creating the Welfare & Institutions Code; modifying and revamping licensing requirements concerning "institutions for child care"; instituting new enforcement scheme bestowing the DSS' precursor agency with authority to "revoke for cause after a hearing" the license of any noncompliant facility; and retaining provision in the 1913 act making unlicensed operation a misdemeanor offense).

---

[1] Plaintiffs also lodge numerous evidentiary objections to Defendants' Request for Judicial Notice in their Opposition.  (Opp'n at 20:11–21:12.)

[2] For a brief history concerning the roles government and private philanthropic organizations—namely religious ministries and charities—have played in administering social services in the United States, and the varying extent to which government has sought to regulate those private endeavors, *see* Carl H. Esbeck, *Government Regulation of Religiously Based Social Services:  The First Amendment Considerations*, 19 Hast. Const. L. Q. 343, 350 (1992).  In that scholarly work, Esbeck explains that governments "undertook a more affirmative role" in the provision of social services "[f]ollowing the Civil War, and increasingly during the first quarter of [the Twentieth Century]." *Id.*  California's 1913 licensing measure roughly aligns with this timeline.

In 1984, the California Legislature examined afresh the State's child day care policies. *See* Cal. Health & Safety Code § 1596.72. Finding that California suffered from "a tremendous shortage of regulated childcare," and that "only a small fraction of families who needed childcare ha[d] it," the Legislature concluded a new "comprehensive, quality system for licensing childcare facilities" was the best medicine to resolve this acute problem. *Id.* §§ 1596.72(b)–(c), 1597.90 (providing the California Community Care Facilities Act, Cal. Health & Safety Code § 1500 *et seq.* no longer applies to "child day care facilities," only the Act does). So, the Legislature passed the Act.

The Act establishes a licensing regime for "child day care facilities," defined as any facility that "provide[s] non-medical care to children under 18 years of age in need of personal services, supervision, or assistance essential to sustaining the activities of daily living or for the protection of the individual on less than a 24-hour basis." Cal. Health & Safety Code § 1596.76. Preschools indisputably fall within this definition. *See N. Valley Baptist Church v. McMahon*, 696 F. Supp. 518, 520 (E.D. Cal. 1988), *aff'd*, 893 F.2d 1139 (9th Cir. 1990). The Act enables any private "person, firm, partnership, association or corporation"—religiously affiliated or secular—to open and operate a child day care facility. *See* Cal. Health & Safety Code § 1596.80. But the Act requires that all persons, firms, partnerships, or corporations who wish to do so *must* attain a license from the DSS first. *Id.* ("No person, firm, partnership, association, or corporation shall operate, establish, manage, conduct, or maintain a child day care facility in this state without a current valid license[.]"). This licensing requirement applies regardless of whether the child day care facility sought to be established is religiously affiliated or not.

To qualify for a license, an applicant must certify to the DSS that it is able to comply with the requirements of the Act and its regulations promulgated by the DSS thereunder. *See, e.g.*, Cal. Health & Safety Code §§ 1596.856 ("If the department finds that the applicant is not in compliance with the act or its regulations promulgated under this act, the department shall deny the applicant a license."), 1596.97 ("A license . . . for a day care center for children may be issued providing the licensee has been found not to be in

- 4 -

violation of any statutory requirements or rules and regulations pursuant to [the Act].");
*see also id.* § 1596.81(a) ("The department shall adopt, amend, or repeal . . . any rules and
regulations which may be necessary to carry out this [A]ct.").   The Act and the
implementing regulations "address a wide variety of matters potentially affecting the health
and safety of children" enrolled at child day care centers, including, *inter alia*:
immunization of children and staff, *see id.* § 1596.7995; background checks for staff and
volunteers, *see id.* §§ 1596.871, 1596.877; medical training for staff, *see id.* §§ 1596.866,
1596.8661; and the physical integrity and safety of the day care's premises, *see id.* §§
1596.95, 1596.954, 1597.16.

The DSS is responsible for monitoring providers' continued compliance with the
Act.[3]   *See, e.g.*, Cal. Health & Safety Code § 1596.878 ("The department shall establish,
administer, and monitor programs which license child day care facilities consistent with
the provisions of this [A]ct.").   To this end, the DSS may "enter and inspect any [child day
care facility] at any time, with or without notice, to secure compliance with, or to prevent
a violation of," the Act and its rules and regulations.   *See id.* § 1596.852.   Onsite inspections
may be either prompted by a third-party complaint that alleges a reasonable basis to believe
a violation exists, *id.* § 1596.852(b), or undertaken on the DSS' own accord, *see id.* §
1597.09.   Several circumstances may instigate the DSS to conduct an onsite visit or
inspection, including, but not limited to, when a license explicitly calls for an annual
inspection, when a provider is on probation, when an employee or volunteer previously has
been ordered out of a facility by the DSS, or when a provider's name is drawn by "a random
sampling methodology" pursuant to the DSS' obligation to inspect 30 percent of facilities
each year.   *See id.* § 1597.09(b), (c)(1).   The DSS must inspect all licensed facilities at least
once within a three-year period.   *Id.* § 1597.09(d).

Beyond its authority to *monitor* compliance with the Act, the DSS also has power to
*enforce* compliance with the Act.   The DSS may issue citations to, and levy fines upon,

---

[3] A "provider," as that term is defined in the Act, is one who operates a licensed child day care
facility.   Cal. Health & Safety Code § 1596.791.

unlicensed and noncompliant licensed facilities. *See* Cal. Health & Safety Code §§ 15963a(a), 1596.93b(a)–(b); *see also id.* §§ 1597.62(a), 1596.99(b)(1), 1596.891(a). The DSS also has authority to suspend or revoke a provider's license. *See id.* § 1596.887(a). To do so, the DSS generally must institute an administrative proceeding. Revocation or suspension is warranted when the DSS shows by a preponderance of the evidence that the provider committed, aided, abetted, or permitted a violation of the Act or its implementing regulations. *See id.* §§ 1596.885, 1596.889, 1596.8895. But the DSS also may suspend a provider's license temporarily, without adjudication, where it finds suspension is "necessary to protect any child of a child day care facility from physical or mental abuse, abandonment, or any other substantial threat to health or safety." *Id.* § 1596.886. Finally, the Act permits the DSS Director to "bring an action" in civil court "to enjoin the violation or threatened violation" of the Act. *Id.* § 1596.89.

In addition to the civil and administrative remedies available to the DSS, the Act also provides for *criminal* remedies, all three of which may be deployed in combination with one another. *See* Cal. Health & Safety Code § 1596.892. The Act's criminal-enforcement device principally resides at Cal. Health & Safety Code § 1596.890 ("Section 1596.890"), which, in pertinent part, states, "Any person who willfully or repeatedly violates any provision of this [Act], or any rule or regulation promulgated under this [Act], is guilty of a misdemeanor." *Id.* § 1596.890. To aid with the prosecution of criminal violations of the Act and its regulations, the DSS must "refer for criminal prosecution and/or civil proceedings" the case of any "child care center [] operating without a license." Cal. Code Regs. tit. 22 § 101157(c) ("DSS Regulation 101157(c)").

There are limited statutory exemptions from licensure under the Act. Those exemptions are based upon the type of activities and programs administered by the facility at issue. *See* Cal. Health & Safety Code §§ 1596.792, 1596.793. Whether the institution is religiously affiliated or not has no bearing on whether it qualifies for an exemption. Exempt institutions include: childcare programs operated by state-regulated healthcare facilities, *see id.* § 1596.792(a)–(c); part-time parent cooperatives and childcare provided

by relatives or shared between two families, *see id.* § 1596.792(d)–(f); programs operated by specified public entities when public schools are not in session, *see id.* § 1596.792(g), (1); extended day care programs at private or public schools, *see id.* § 1596.792(h); school parenting or adult education childcare programs operated by school districts, *see id.* § 1596.792(i); temporary childcare once per week or when a parent is onsite, *see id.* § 1596.792(j)–(k); childcare provided by crisis nurseries and drug treatment facilities that house women and their children, *see id.* § 1596.792(n)–(m); and recreation programs operated by camp organizations, *see id.* § 1596.793. Additionally, state preschools, regulated by the California Department of Education, are exempt under the Act. *See id.* § 1596.792(o).

In determining whether an applicant qualifies for a license under the Act, and whether it remains in good standing once licensed, the DSS may not consider "the content of any educational or training program of the facility." *Id.* § 1597.05(a). The Act explicitly limits the DSS' review "to health and safety considerations" only. *Id.* Hence, the DSS may not deny, suspend, or revoke a license based on a facility's curriculum, so long as it does not otherwise violate the Act's health and safety requirements. "In short, under the licensing scheme a day care center remains free to teach, or not to teach, on any subject and in any manner it deems fit." *McMahon*, 696 F. Supp. at 521 (opining that, because of § 1597.05(a), "the centers within the state run the gamut from those performing simple 'babysitting' services to those providing intensive academic, recreational, social adjustment, and/or religious training").

//
//
//
//
//
//
//

22cv0950

**B.       The Complaint's Allegations and Legal Claims**[4]

Plaintiffs are three churches located in San Diego County with active ministries for children.  (*See, e.g.*, Compl. ¶¶ 2–4.)  None of the Plaintiffs currently are licensed to operate a child day care facility, nor do any of the Plaintiffs currently operate an unlicensed facility. (*See id.* ¶¶ 36, 43, 54.)  Grove and Journey do not allege that they have ever sought or obtained a license from the DSS.  And while Foothills previously operated a licensed infant care center and preschool, it ceased doing so in March 2022 after the DSS unearthed repeated violations of the California Department of Public Health ("DPH")'s indoor masking orders for child care settings, and instituted administrative proceedings to revoke Foothills' license.[5]  (*See id.* ¶¶ 17–23.)

Each Plaintiff is now prepared to open a preschool.  (Compl. ¶¶ 27, 36, 44, 54.) Their plans to do so are borne from their "sincerely-held, faith-based commitment to minister to children."  (*Id.*)  This religious conviction, Plaintiffs aver, mandates that only the children of parents who "want to work cooperatively with the Church-Plaintiffs on religious services and activities" may attend their prospective preschools.  (*Id.* ¶ 69.)  That is, Plaintiffs do not intend "to grant autonomy to children with regard to religious activities

---

[4] These facts are taken from the allegations in the Complaint.  The presumption of truth attaches to the Complaint's factual allegations, and the Court construes those allegations, and all reasonable inferences arising therefrom, in a light most favorable to Plaintiffs.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

[5] Foothills alleges the DSS conducted an unannounced inspection of its preschool in September 2021 after an anonymous complaint was lodged against it.  (Compl. ¶ 17.)  Investigators remained onsite for hours and interviewed children without parental consent, presumably pursuant to Cal. Health & Safety Code § 1596.852.  (*Id.*)  The investigation disclosed violations of the DPH's COVID-19 indoor masking orders applicable to child care settings.  (*Id.*)  Plaintiffs allege the DSS "issued numerous fines against Foothills' preschool" for these violations.  (*Id.* ¶ 18.)  Investigators from the DSS returned unannounced, again, in December 2021, at which time they discovered additional violations of DPH's COVID-19 masking order.  (*Id.* ¶ 22.)  The DSS suspended Foothills' license, forcing it to shutter its preschool and infant care center.  (*Id.* ¶ 22.)  Then, the DSS initiated an administrative proceeding to revoke Foothills' license, which was successful.  (*Id.* ¶ 23.)  Foothills declined to appeal the administrative law judge's decision or undertake any other endeavor to restore its license because, in its view, "even a victory would place the church preschool ministry under the continued control of [the] DSS through licensing under the [Act] and regulatory scheme."  (*Id.*)

and services" (*see id.* ¶ 1); the religious component Plaintiffs' programs will be mandatory (*see, e.g., id.* ¶¶ 96–97).

Plaintiffs allege the Act requires them to attain a license to open and operate the preschools they envision. (Compl. ¶¶ 1, 72.) But Plaintiffs "do[] not want [] preschool[s] that operate[] under the pleasure of the [DSS] through the State's licensing scheme." (*Id.* ¶¶ 37, 45, 55.) And so, Plaintiffs have not sought licensure from the DSS. Instead, on June 28, 2022, Plaintiffs commenced the instant action against Defendants Kim Johnson, the DSS Director, and Robert Bonta, the California Attorney General, both of whom are named in their official capacities, seeking to invalidate the Act and its regulations in their entirety. (Compl. ¶¶ 1, 5–6.)

Plaintiffs press two claims: a Free Exercise Claim (*see id.* ¶¶ 87–98) and a Privileges or Immunities Claim (*see id.* ¶¶ 100–10).[6] They seek a "declaration that application of [the Act] to houses of worship violates the First and Fourteenth Amendments," and an "injunction permanently enjoining" Defendants from enforcing the Act.

The Free Exercise Claim: Plaintiffs hold the sincere religious belief they "are mandated to spread the Gospel and make disciples, which of necessity requires teaching children." (Compl. ¶ 66; *see also id.* ¶ 95.) That belief compels Plaintiffs to establish preschools as extensions to their existent ministries for children, and to administer a

---

[6] In their Opposition, Plaintiffs make numerous references to supposed Establishment Clause violations, asserting the Act "also violates the First Amendment by preferring one religion over another," and Free Speech Clause violations, averring the DSS compelled Foothills to "adopt a pro-mask" viewpoint. (*See* Opp'n at 11:4–12:10 (Establishment Clause violations), 18:21–19:10 (Free Speech Clause violations).) But the Complaint contains neither Establishment Clause nor Free Speech Claims. Indeed, there is no allusion anywhere in the Complaint to the Establishment Clause Claim fleshed out in the Opposition. And while the Complaint contains a single allegation that refers to "compelled speech," this averment is nestled under Plaintiffs' Privileges or Immunities Claim. (*See* Compl. ¶ 107.) Plaintiffs cannot employ their Opposition to import claims not actually alleged in their Complaint. *See, e.g., George v. Grossmont Cmty. Coll. Dist. Bd. of Governors*, 22-cv-0424-BAS-DDL, 2022 WL 17330467, at *10 (S.D. Cal. Nov. 29, 2022) ("[S]tatements made in briefs neither constitute well-pled allegations entitled to the presumption of truth nor admissible evidence"; collecting authorities). Thus, the Court declines to read into the Complaint—and to absolve Plaintiffs' obligation under Rule 8 to include in their pleading short and plain statements of—claims under the Establishment and Free Speech Clauses of the First Amendment.

uniform, mandatory curriculum to their students.  (*See id.* ¶¶ 66, 95–98.)  Accordingly, Plaintiffs aver they cannot provide "personal religious autonomy" to the children enrolled at their preschools while remaining true to their religious convictions.  (*Id.* ¶¶ 95–98.)

Plaintiffs allege the Act interferes with their free exercise of these religious beliefs.  But Plaintiffs do not identify a single provision of the Act, itself, that conflicts with their "faith-based commitment" to administer uniform, religious education at their preschools.  Rather, they allege a single DSS regulation infringes upon this sincerely held belief:  Cal. Code Regs. tit. 22 § 101223(a)(5), or, as one of this Court's sister tribunals once referred to it, the "religious services provision."  *See McMahon*, 696 F. Supp. at 533.

The religious services provision states, in pertinent part:

(a)     The licensee shall ensure that each child is accorded the following personal rights:

*        *        *        *

(5)     To be free to attend religious services or activities of his/her choice.

(A)     Attendance at religious services in or outside of the center shall be voluntary.  The child's authorized representative shall make decisions about the child's attendance at religious services.

Cal. Code Regs. tit. 22 § 101223(a)(5).  The regulation in which the religious service provision is nestled also confers several other "personal rights" to children enrolled in licensed child day care facilities.[7]  *Id.* § 101223(a)(1)–(5).  The DSS requires providers to ensure each child is afforded these personal rights, *see id.* § 101223(c), and to inform each child's authorized representative of these rights, *see id.* § 101223(b).

---

[7] Those other "personal rights" include, *inter alia*:  (1) "dignity in . . . personal relationships with staff"; (2) "safe, healthful, and comfortable accommodations"; (3) freedom "from corporal or unusual punishment, infliction of pain, humiliation, intimidation, ridicule, coercion, threat, [and] mental abuse." Cal. Code Regs. tit. 22 § 101223(a)(1)–(5).

22cv0950

Plaintiffs interpret the religious services provision as *requiring* preschools operated by houses of worship to provide all enrollees autonomy with respect to religious education and training. (Compl. ¶¶ 95–98.)  They, therefore, read the religious services provision to implicitly prohibit parochial preschools from instituting compulsory attendance at religious events and participation in religious activities. (*Id.*)  Accordingly, Plaintiffs aver this DSS regulation "imposes a substantial burden on the free exercise of [their] religion." (*Id.* ¶ 98.)

The Privileges or Immunities Claim:   Plaintiffs allege the Act imposes unconstitutional conditions as a requirement of licensure under the Act. (Compl. ¶¶ 99–110.)  To acquire and maintain a license, Plaintiffs aver they must waive constitutional rights guaranteed to them by the Fourth, Fifth, Sixth, and Seventh Amendments. (*See id.* ¶¶ 102–05.)  For example, Plaintiffs allege that by submitting themselves to:

- Cal. Health & Safety Code § 1596.852, which permits the DSS to enter and inspect facilities unannounced, and Cal. Code Regs. tit. 22 § 101200(c), which permits the DSS to review and remove files, Plaintiffs are relinquishing rights secured by the Fourth Amendment. (*See id.* ¶ 102.)

- Cal. Code Regs. tit. 22 § 101200(b), which permits the DSS to interview staff without notice of their right to remain silent, in combination with Section 1596.890, which exposes those who violate the Act to criminal repercussions, Plaintiffs are relinquishing rights secured by the Fifth Amendment. (*See id.* ¶ 103.)

- Cal. Health & Safety Code § 1596.887(a), which relegates license-suspension and revocation proceedings to an administrative tribunal as opposed to a civil one with the option of a jury, Plaintiffs are relinquishing rights secured by the Sixth and Seventh Amendments. (*See id.* ¶¶ 104–05.)

Plaintiffs style this "unconstitutional-conditions" theory of the Act's invalidity as a claim arising under the Privileges or Immunities Clause of the Fourteenth Amendment. (*See, e.g.*, Compl. ¶ 110 ("The required licensing scheme sets unconstitutional conditions on the Church-Plaintiffs and deprives them of the privileges and immunities of citizenship guaranteed by the Fourteenth Amendment.").)

## II.    REQUEST FOR JUDICIAL NOTICE

Before delving into the challenges raised in Defendants' Motion, the Court first addresses the contemporaneously filed Request for Judicial Notice.  (*See* RJN.)  Under Federal Rule of Evidence 201(b), a court may judicially notice a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  When a party seeks judicial notice of a document, the Rule 201(b) inquiry is two-fold.  First, the court must consider whether the document is from "a source[] whose accuracy cannot reasonably be questioned."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).  Second, the court must "consider—and identify—which fact or facts it is noticing from the document."  *Id.*  "Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."  *Id.*  Facts subject to judicial notice may be considered on a motion to dismiss, *see Maiman v. Talbott*, No. SACV 09-0012 AG (ANx), 2011 WL 13065750, at *2 (C.D. Cal. Aug. 29, 2011), as well as on a facial challenge to subject matter jurisdiction, *Chaudry v. Cnty. of San Diego*, No. 21cv1847-GPC (AHG), 2022 WL 17652794, at *3 (S.D. Cal. Dec. 13, 2022).

Of the appendages to Defendants' Request for Judicial Notice, there is an official document authored by the California Department of Public Health (defined previously as "DPH"), titled "Guidance for the Use of Face Masks," dated April 20, 2022.  (Masking Guidance, Ex. E to RJN, ECF No. 14-5.)  Defendants ask the Court to take judicial notice of a single fact contained in the Masking Guidance:  that DPH terminated "the universal masking requirement for . . . [c]hildcare settings" effective March 11, 2022.  (*Id.* at 1.)

The Court **GRANTS** this request.  The Masking Guidance is an official state-agency document, posted online by the DPH to its official website.  Plaintiffs do not contest otherwise.  As such, it is a judicially noticeable public record.  *See, e.g.*, *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 924 n.3 (9th Cir. 2002) (instructing judicial notice of agency documents is appropriate where there is no dispute as to authenticity); *accord Lewis v. M&T Bank*, No. 21-CV-933, 2022 WL 775758, at *2 n.4

(2d Cir. Mar. 15, 2022) (Summary Order) ("We regularly take judicial notice of agency documents on official websites"; collecting authorities). And the fact of which Defendants seek judicial notice—that DPH lifted indoor masking requirements for childcare settings in March 2022—not only is uncontroverted but also is precisely the sort of fact that is judicially noticeable. *See cf. Metroflex Oceanside LLC v. Newsom*, 532 F. Supp. 3d 976, 980 (S.D. Cal. 2021) (taking judicial notice of "information about the COVID-19 virus, government orders related to the COVID-19 pandemic, and rulings of other federal courts").

Because this Court need not—and does not—rely upon any of the other information and documents Defendants proffer to resolve the Motion, the remainder of the Request for Judicial Notice is **DENIED**.

## III. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

Under Rule 12(b)(1), a party may move to dismiss a claim based upon the court's lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989). A jurisdictional attack under Rule 12(b)(1) can be either facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

In a facial attack, the challenger asserts that the allegations in the complaint are insufficient to invoke federal jurisdiction, and the court is limited in its review to the allegations in the complaint. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). When a movant presses a facial attack, the court assumes the truth of the allegations in the complaint. *Lee*, 227 F.3d at 1242.

By contrast, in a factual attack, the challenger provides evidence an alleged fact in the complaint is false, thereby resulting in a lack of subject matter jurisdiction. *Meyer*, 373 F.3d at 1039. Therefore, under a factual attack, the allegations in the complaint are not presumed to be true, and the court is not constrained to review the pleadings only, "but

22cv0950

may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

Where, as here, a Rule 12(b)(1) motion is brought alongside a Rule 12(b)(6) motion, it is appropriate for the court to first consider and address the disputed jurisdictional issues under the former before analyzing the merits of a claim under the latter. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) ("[T]he jurisdictional question of standing precedes, and does not require, analysis of the merits." (quoting *Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008))). If, upon analysis of the Rule 12(b)(1) motion, the court finds it lacks subject matter jurisdiction over the action or a claim pressed therein, it need not address the merits issues raised in the collateral Rule 12(b)(6) motion. *See Toyota Landscaping Co., Inc. v. S. Cal. Dist. Council of Laborers*, 11 F.3d 114, 117 (9th Cir. 1993); *Prather v. AT&T Inc.*, 996 F. Supp. 2d 861, 871 n.8 (N.D. Cal. 2013) ("Having concluded that it lacks subject matter jurisdiction over [plaintiff's] claim, the Court need not—and indeed cannot—address [d]efendants' alternative grounds for dismissal under [Rules] 12(b)(6) and 9(b).").

## B.   Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the allegations underlying the claims in a complaint. *See Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001). The procedural posture on a Rule 12(b)(6) motion requires the court to accept all factual allegations pleaded in the complaint as true and to construe those allegations, and draw all reasonable inferences therefrom, in favor of the plaintiff. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). To avoid Rule 12(b)(6) dismissal, a complaint must plead sufficient factual allegations to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A Rule 12(b)(6) dismissal may be based on either a 'lack of

cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys. LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

## IV.   ANALYSIS

Defendants move for dismissal of the Complaint on several grounds. (*See generally* Mot.) <u>First</u>, Defendant Bonta asserts the Eleventh Amendment shields him from pre-enforcement challenges to the Act. (*See id.* at 11:15–13:10.) <u>Second</u>, Defendants collectively assert Plaintiffs' Free Exercise Claim fails for lack of standing under Rule 12(b)(1) (*see id.* at 6:26–11:13) and for failure to allege the requisite elements of such a claim under Rule 12(b)(6) (*see id.* at 14:17–23:9). And <u>third</u>, Defendants contend Plaintiffs' Privileges or Immunities Claim is foreclosed by the *Slaughter House Cases*, 83 U.S. 36 (1872)—a precedent that has stood firm for over 150 years, largely without abrogation.

### A.   Defendant Bonta Does Not Enjoy Eleventh Amendment Immunity From Suit

#### 1.   Eleventh Amendment Immunity Framework

The Eleventh Amendment bars federal jurisdiction over suits by individuals against a State and its instrumentalities unless either the State consents to waive its sovereign immunity or Congress abrogates it. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984). "[A] suit against a [S]tate official in his or her official capacity is not a suit against the official but rather is a suit against the official's *office*[,]" *i.e.*, a State instrumentality. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (emphasis added); *see also Lewis v. Clarke*, 581 U.S. 155, 162 (2017) ("In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself."). As a result, the Eleventh Amendment also bars official-capacity suits absent the State's waiver of sovereign immunity or Congress's abrogation. *Will*, 491 U.S. at 71.

22cv0950

However, the Eleventh Amendment proscription of official-capacity suits absent waiver or abrogation is not absolute.  Under *Ex Parte Young*, 209 U.S. 123 (1908), there exists "an exception for 'actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law.'" *Mecinas v. Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022) (quoting *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012)).  The *Ex Parte Young* exception is available only when the state-official defendant has "some connection with the enforcement of the act."  *Id.* (quoting *Brown*, 674 F.3d at 1134).  That connection must be "fairly direct."  *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998).  Anything less and the named state-official defendant effectively is "a mere representative of the state." *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 619 (1999).

### 2.  Applying the Foregoing Framework

There is no dispute the instant action seeks prospective injunctive and declaratory relief only.  (Compl., Prayer for Relief ¶¶ 1–2); *see Mecinas*, 30 F.4th at 903 (opining the *Ex Parte Young* exception is limited to "actions for prospective declaratory or injunctive relief").  Moreover, the parties appear to agree Defendant Johnson, the DSS Director, is not immune from a suit seeking to invalidate the Act.  (*See* Reply at 4:27-28 ("Here, under the Act and its implementing regulations, *direct* enforcement authority is vested exclusively in the [DSS]." (emphasis in original)).)  However, Defendant Bonta, the California Attorney General, avers the Eleventh Amendment immunizes him from the instant action because the Act does not explicitly vest him with any enforcement authority at all and, even to the extent it does, that authority is too "generalized" to invoke *Ex Parte Young*.  (Mot. at 11:15–13:10; Reply at 3:23–5:5.)  In response, Plaintiffs contend the criminal-enforcement mechanism at Section 1596.890 acts as a statutory hook, which sufficiently ties Bonta to the Act's enforcement for *Ex Parte Young* purposes.  (Opp'n at 6:4-17.)  To resolve this dispute, and to determine whether the Attorney General has a "fairly direct" connection to enforcement of the Act, the Court looks first to the relevant statutory and regulatory language.

The Act provides "civil," "administrative," and, most relevant here, "criminal" remedies to enforce violations thereof.  Cal. Health & Safety Code § 1596.892.  The "criminal remed[y]" prescribed by the Act is nestled in Section 1596.890.  That statute provides, "Any person who willfully or repeatedly violates any provision of this chapter, or any rule or regulation promulgated under this chapter is guilty of a misdemeanor." *Id.* § 1596.890.  DSS Regulation 101157(c) requires the DSS to refer child day care centers "operating without a license" for "criminal prosecution and/or civil proceedings."

Although Bonta accurately notes the is Act silent with respect to who or which agency is responsible for enforcing criminal violations under Section 1596.890,[8] an examination of California law elucidates that authority lies directly with district attorneys, despite the absence of explicit reference to them.  Article V, Section 13 of the California Constitution and California Government Code Section 265000 give "sole responsibility" to "the public prosecutor" for "[t]he prosecution of criminal offenses." *Chodosh v. Comm'n on Judicial Performance*, 81 Cal. App. 5th 248, 266 (2022) (quoting *Dix v. Superior Court*, 53 Cal. 3d 442, 451 (1991)); *see* Cal. Govt. Code § 26500 ("The public prosecutor shall attend the courts, and within his or her discretion shall initiate and conduct on behalf of the people all prosecutions for public offenses.").  That responsibility extends to felonies *and* misdemeanors, like Section 1596.890.  *See People v. Villatoro*, 44 Cal. App. 5th 365, 369 (2020) ("[A]ll criminal proceedings must be brought in the name of the state of the People of the State of California" (quoting *People v. Pellegrino*, 27 Cal. App. 3d 193, 206 (1972))); *see also Pellegrino*, 27 Cal. App. 3d at 206 ("Due process of law requires that  criminal prosecutions be instituted through the regular processes of law.

---

[8] The Court notes that despite the absence of an explicit reference to district attorneys—or any other State official—in Section 1596.890 and its related provisions, other provisions of the Act contain circumstantial evidence district attorneys, indeed, are roped into its enforcement scheme.  For example, Cal. Health & Safety Code § 1596.875(c) states that one of the DSS' duties "[t]o assure compliance" with the Act and its implementing regulations is to "[c]onduct an annual seminar for representatives of enforcement agencies, including, but not limited to, police officers, *district attorneys*, and judges." (emphasis added).  As explained in more fulsome detail above and below, the implication drawn from this provision—that district attorneys have direct authority and responsibility for the Act's criminal enforcement mechanisms—is borne out in the California Constitution and State law.

- 17 -

These regular processes include the requirement that the institution of any criminal proceedings be authorized and approved by the district attorney.").

Hence, because the Act contains a device for criminal enforcement in Section 1596.890, and because no provision in the Act or its implementing regulations delegates to another official or agency authority to institute proceedings under Section 1596.890, district attorneys have *direct* authority and responsibility under California law to dispense the Act's criminal remedies.

The California Attorney General has "direct supervision over every district attorney" within the State.  *See* Cal. Const. Art. V, § 13.  But "general supervisory powers" over the official tasked with direct enforcement of a challenged law generally does not present a sufficient connection to the statute to invoke *Ex Parte Young*. *E.g., Snoeck*, 153 F.3d at 986 (quoting *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)); *see also Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir. 1992) ("We doubt that the general supervisory powers of the California Attorney General are sufficient to establish the connection with enforcement required by *Ex Parte Young*."); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) ("[S]tate attorneys general are not invariably proper defendants in challenges to state criminal laws."); (*see also* Reply at 4:13-22 (collecting authorities).)  Unless the state attorney general can "direct, in a binding fashion, the prosecutorial activities of the officers who actually enforce the law or bring his own prosecution, he may not be a proper defendant."  *Wasden*, 376 F.3d at 919 (citing, *inter alia, S. Pac. Transp. Co. v. Brown*, 651 F.2d 613, 614 (9th Cir. 1980)).  Only when the elements of control over subordinate prosecutorial activities or concurrent legal authority to prosecute are present can state attorneys general be said to have a "fairly direct" connection to the enforcement of a challenged act, as opposed to a generalized obligation to see to it the law is enforced.

The key to unlocking the question whether Bonta, as California Attorney General, can "direct" district attorneys in their enforcement of Section 1596.890, or bring such a prosecution on his own, is a question of State law.  Again, Article V, Section 13 of the

- 18 -

California Constitution holds the key.  That provision designates the Attorney General as "chief law enforcement officer of the State."  Cal. Const. Art. V, § 13.  As such, the Attorney General not only has direct supervisory authority of "every district attorney," "sheriff," and all "other law enforcement officers as may be designated by law," but also has power to "assist district attorney[s] in the discharge of the duties of that office" when "required by the public interest or directed by the Governor." *Id.*  Moreover, Article V, Section 13 of the California Constitution provides, "[W]henever it is the opinion of the Attorney General any law of the State is not being adequately enforced in any county, it shall be the duty of the Attorney General to prosecute any violations of law . . . and in such cases the Attorney General shall have all the powers of a district attorney."  Hence, Article V, Section 13 of the California Constitution enables the Attorney General, in effect, "to deputize himself (or be deputized by the governor) to stand in the role of [the district attorneys], and in that role exercise the same powers to enforce [Section 1596.890] the [district attorneys] would have." *See Wasden*, 376 F.3d at 920.  Accordingly, the Attorney General has concurrent authority under California law to prosecute criminal misdemeanor offenses of the Act pursuant Section 1596.890.  This is a sufficient connection for Plaintiffs to bring a claim against Bonta under *Ex Parte Young.*

The Court's conclusion rests on all fours with two relatively recent Ninth Circuit precedents: *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris* ("*Ass'n des Eleveurs*"), 729 F.3d 937 (9th Cir. 2013), and *Planned Parenthood of Idaho, Inc. v. Wasden* ("*Wasden*"), 376 F.3d at 908.  *Ass'n des Eleveurs* involved a challenge to California's ban on the production and sale of products containing fattened duck liver, also known as foie gras.  729 F.3d at 937. (citing Cal. Health & Safety Code §§ 25980 *et seq.*).  The foie gras ban employs civil penalties as its enforcement mechanism; authority to pursue civil penalties against violators is expressly conferred to the "district attorney of the county in which the violation occurred." *Id.* at 943 (quoting Cal. Health & Safety Code § 25983(c)).  Raising an argument similar to the one invoked by Bonta here, the California Attorney General at the time averred she was immune from suits challenging the validity

of California's foie gras ban, in part because the ban explicitly vests enforcement responsibility and authority in "district attorney[s]" only, not the Attorney General.  *Id.* at 943–45.

Just as this Court does in the instant action, the Ninth Circuit rejected the Attorney General's rigid *Ex Parte Young* analysis.  The *Ass'n des Eleveurs* Court turned to Article V, Section 13 of the California Constitution, just as this Court does here, to glean how to properly assess the closeness of the Attorney General to the enforcement of the foie gras ban.  *Id.* at 942–44 (citing Cal. Const. Art. V, § 13).  And just as this Court now finds, the *Ass'n des Eleveurs* Court concluded the "combination" of the foie gras ban's enforcement device, which gives district attorneys authority to prosecute violations, along with Article V, Section 13 of the California Constitution, which gives the Attorney General the powers and duties of a district attorney, established "sufficient enforcement power" to justify the *Ex Parte Young* exception.  *Id.* at 944.

In *Wasden*, plaintiffs sought to invalidate newly enacted limitations and restrictions on abortion access in Idaho. 376 F.3d at 908.  Under the challenged statutory regime, enforcement power rested with "county prosecutors," not the Idaho Attorney General.  *Id.* at 919.  Nevertheless, the *Wasden* plaintiffs named both the prosecutor in their county of residence *and* the Idaho Attorney General as defendants.  *Id.* at 919–20.  The Idaho Attorney General, much like Bonta here, "denie[d] having authority to enforce any part of the statute."  *Id.* at 919.  However, upon close examination of Idaho law, the *Wasden* Court concluded differently.  It found particularly important that long-standing and well-established Idaho law—similar to California law—enables the Idaho Attorney General to "assist" county prosecutors in enforcement actions, either at will or pursuant to a directive by the Idaho Governor, and, "in [that] assistance, [to] *do every act* that the county attorney can perform."  *Id.* at 919–20 (quoting *Newman v. Lance*, 922 P.2d 395, 399–401 (1996)).  The *Wasden* Court held the Idaho Attorney General's power to effectively "stand in the role of a county prosecutor" amounted to a sufficiently direct connection to the enforcement of the challenged abortion limitations and restrictions.   *See id.* at 920.

- 20 -

Accordingly, the *Wasden* Court concluded the Idaho Attorney General was a proper defendant under *Ex Parte Young*.  *See id.*

Bonta appears to raise several alternative arguments, all of which are unavailing. First, Bonta seems to suggest the criminal remedies delineated in Section 1596.890 are not an integral part of the Act's enforcement regime.  In support, he argues that although Section 1596.890 criminalizes "willful" and "repeated" violations of the Act, DSS Regulation 101157(c) only requires the DSS to refer for criminal prosecution *unlicensed* child day care operators.  It does not require the DSS to notify law enforcement of licensed providers who have committed one of "the myriad [of] other violations for which a [licensed] facility can be cited under the Act."  (Reply at 5:2-5.)  As an initial matter, the Court rejects the premise Section 1596.890 is not an integral feature to the Act's enforcement, even if it is circumscribed by DSS Regulation 101157(c) as Bonta appears to contend.   More fundamentally, however,   a state-official defendant's role in the enforcement of a statute need not be "integral" for the *Ex Parte Young* exception to apply. *See Sullivan v. Ferguson*, --- F. Supp. 3d. ---, No. 3:22-cv-5403-DGE, 2022 WL 13969427, at *6 (W.D. Wash. Oct. 24, 2022).   Nor must a state-official defendant's authority to enforce a challenged act be exclusive or sweeping.  *See id.* ("As *Wasden* illustrates, the ability to enforce an allegedly unconstitutional law, even if shared concurrently with another party, is sufficient to establish the requisite connection for relief pursuant to *Ex Parte Young*" (citing *Waden*, 376 F.3d at 920)).  *Ex Parte Young*'s standard is not as restrictive as Bonta appears to contend; it is satisfied if a plaintiff can show the state-official defendant has "some connection with the enforcement of the act."  *Mecinas*, 30 F.4th at 903 (quoting *Brown*, 674 F.3d at 1134).

Bonta also repeatedly refers to his enforcement authority under the Act as "generalized" and "indirect"  (Mot. at 12:15, 13:1-2; Reply at 4:8-9.)   But findings of "generalized" enforcement authority "ha[ve] primarily been associated with cases where executive officials retain no direct enforcement authority to prosecute state laws (such as governors)."  *See Sullivan,* 2022 WL 13969427, at *6 (collecting authorities).  By contrast,

1    and for the reasons stated above, the Attorney General's authority under the criminal-

2    enforcement regime of the Act is direct, albeit concurrent alongside district attorneys.

3    Accordingly, this argument does not hold water.

4         Finally, Bonta appears to argue he retains Eleventh Amendment immunity from suit

5    because Plaintiffs do not allege they have been threatened with prosecution under Section

6    1596.890.  (Reply at 4:20-22.)  In support, he cites to *McMahon*, 696 F. Supp. at 518, a

7    prior case deciding a similar challenge to the Act.  Although Bonta concedes the Attorney

8    General was a properly named defendant in *McMahon*, he asserts Eleventh Amendment

9    immunity ceded there only because the DSS "ultimately referred [the *McMahon* plaintiffs']

10   preschool's violation for unlicensed operation to the Attorney General."  (Opp'n at 4:23-

11   27.)  By contrast, here, Plaintiffs have not been referred for prosecution under Section

12   1596.890.  They do not even operate child day care facilities.  Therefore, Bonta claims

13   Plaintiffs do not face the foreseeable risk of being ensnared in an enforcement action under

14   Section 1596.890, let alone a referral of a violation by the DSS to a district attorney.  (*See*

15   *id.*)  But as Ninth Circuit precedent instructs—and as Bonta himself seems to acknowledge

16   (*see* Opp'n at 4:23-27)—whether there exists a threat of imminent prosecution is relevant

17   only to standing and ripeness analysis, not the *Ex Parte Young* exception.  *See, e.g.*, *Nat'l*

18   *Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002) ("We decline to read

19   additional 'ripeness' or 'imminence' requirements into the *Ex Parte Young* exception to

20   Eleventh Amendment immunity in actions for declaratory relief beyond those already

21   imposed by a general Article III and prudential ripeness analysis.").

22        Simply put, the Plaintiffs have drawn a "fairly direct" connection between the Act's

23   criminal enforcement mechanism and Bonta.  Accordingly, the Court denies the Motion to

24   the extent it asserts the Eleventh Amendment immunizes Bonta from all claims.

### B.   Plaintiffs Lack Standing to Pursue Their Free Exercise Claim

#### 1.   Standing Doctrine Framework

27        It is neither the role of federal courts "to issue advisory opinions nor declare rights

28   in hypothetical cases."  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138

(9th Cir. 2000) (en banc).  Article III, Section 2 of the United States Constitution grants the federal judiciary power to adjudicate only "live 'cases or controversies.'"  *Id.*  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process[.]'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

To establish standing, a plaintiff must demonstrate the irreducible constitutional minimum of:  (1) an injury-in-fact vis à vis "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) causation—that the injury is "fairly traceable to the challenged action of the defendant"; and (3) redressability—that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560–61 (internal citations and quotations omitted).

"Each element of standing must be supported . . . with the manner and degree of evidence required at the successive stage of litigation."  *Maya*, 658 F.3d at 1068.  To survive a facial Rule 12(b)(1) challenge to standing, a plaintiff "must 'clearly . . . allege facts demonstrating' each element."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  At this stage, the Court presumes to be true the factual allegations in the pleadings, and construes in favor of the plaintiff all reasonable inferences that emanate therefrom.  *See Lujan*, 504 U.S. at 555 (instructing district courts to "presum[e] that general allegations embrace those specific facts that are necessary to support a claim" on a Rule 12(b)(1) facial challenge); *see also Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020) ("A facial attack tests whether the allegations, taken as true, support an inference that the elements of standing exist." (citation omitted)); *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) ("When the defendant asserts a 'facial' challenge to standing ... it remains the case that courts should continue to draw from the pleadings all reasonable inferences in the plaintiff's favor[.]"); *but see PNC Equipment Fin., LLC v. Cal. Fairs Fin. Auth.*, Case No. CV 11-

- 23 -

6248 MMM (DTBx), 2012 WL 12506870, at *6 n.29 (C.D. Cal. Feb. 9, 2012) (opining that, "[a]lthough defendant has mounted a facial attack on jurisdiction, the court can consider documents that are proper subjects of judicial notice in deciding the motion"; collecting authorities).

Standing presents particularly unique issues where, as here, the plaintiff brings an action challenging the constitutionality of an act before the act has been enforced against it. *See Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022) ("A 'recurring issue' for federal courts is determining when the threat of enforcement creates a sufficient injury for a party to have standing to bring a pre-enforcement challenge to a law [on constitutional grounds.].").  To bring a pre-enforcement challenge, a plaintiff must demonstrate:  (1) it intends "to engage in a course of conduct arguably affected with a constitutional interest"; (2) that such course of conduct is "proscribed by a statute"; and (3) "there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Driehaus*, 573 U.S. at 158 (same).  This iteration of *Lujan*'s standing analysis "is derived from the well-recognized principle that a person need not suffer prosecution or other enforcement action in order to raise a constitutional objection to a statute." *Vt. All. for Ethical Healthcare, Inc. v. Hoser*, 274 F. Supp. 3d 227, 238 (D. Vt. 2017) (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)).  The absence of any one of the elements required for a pre-enforcement challenge dooms the plaintiff's standing.

Standing is a claim-by-claim analysis.  *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018). "[A] plaintiff must demonstrate standing for each claim [it] seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  "Suffering one species of injury does not confer standing on a plaintiff to press claims based on another species of injury, even if the injuries share a common genus." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 733 (1st Cir. 2016); *see also Blum v. Yaretsky*, 457 U.S. 991, 999 (1992) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of

22cv0950

that injury the necessary stake in litigating conduct of another kind, although similar, to which it has not been subject.").

## 2.      Standing in the Context of the Free Exercise Clause

The Free Exercise Clause of the First Amendment provides, "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. Amend. I.  The Free Exercise Clause is applicable to the States under the terms of the Fourteenth Amendment.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  "The Clause protects not only the right to harbor religious beliefs inwardly and secretly.  It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (quoting *Empl't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).

Modern Supreme Court jurisprudence "has dispensed with rigid [standing] requirements" for First Amendment free-speech and free-exercise claims.  *See Tingley*, 47 F.4th at 1066–67 (quoting *Cal. Pro-Life Coal. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2005)).  Allegations that a purportedly unconstitutional act, though not yet enforced against it, caused the plaintiff to self-censor are generally adequate to establish an injury-in-fact in the context of the First Amendment.  *See Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A] chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury.").

But to acquire standing to pursue a Free Exercise claim, a plaintiff still must, at a minimum, show there exists some conflict between one of its religious convictions and a challenged governmental action.  *See, e.g.*, *McGowan v. State of Maryland*, 366 U.S. 420, 429 (1961) (holding appellants had "no standing to raise" Free Exercise claim where they "allege only economic injury to themselves; they do not allege any infringement of their own religious freedoms[,]" and "the record is silent as to what appellants' religious beliefs are"); *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 224 n.9 (1963) (holding "the requirements for standing to challenge state action under . . . the Free Exercise Clause

. . . include[s] proof that particular religious freedoms are infringed"); *United States v. Top Sky*, 547 F.2d 483, 485 (9th Cir. 1976) (finding criminal defendant, who had been convicted of selling bald eagle feathers in violation of the Bald Eagle Protection Act, lacked standing to raise free exercise challenge aimed at that Act because he did not aver the conduct for which he was prosecuted was religiously, as opposed to commercially, motivated). Without these sorts of allegations, the plaintiff fails to allege it suffered an injury-in-fact. *See, e.g.*, *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) (finding plaintiff who failed to proffer "any facts to suggest that the state has coerced her in her religious practices" failed to allege she "suffered an injury-in-fact under the Free Exercise Clause and does not have standing to pursue that claim"); *Vines v. Board of Educ. of Zion Sch. Dist. No. 6*, No. 01C7455, 2002 WL 58815, at *3 (N.D. Ill. Jan. 14, 2002) (holding plaintiff lacked standing to challenge school district's dress code under Free Exercise Clause because she failed to allege she could not simultaneously comply with the code and remain true to her religious beliefs). Indeed, "[t]he [Supreme] Court has held[] a free exercise plaintiff generally must 'show that his good-faith religious beliefs are hampered before he acquires standing to attack a statute under the Free Exercise Clause.'" *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2100 (2019) (Gorsuch, J., concurring) (quoting *Braunfeld v. Brown*, 366 U.S. 599, 615 (1961) (Brennan, J., concurring and dissenting)); *see Harris v. McRae*, 448 U.S. 297, 321 (1980) ("[I]t is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." (internal quotation marks and citation omitted)).

### 3. Applying the Foregoing Principles to Plaintiffs' Free Exercise Claim

#### i. Plaintiffs' Free Exercise Claim is Not Directed Towards the Act's Licensure Requirement

In their Opposition, Plaintiffs appear to cast their Free Exercise Claim as directed at the Act's licensing requirement, which principally is codified at Cal. Health & Safety Code § 1596.80. (Opp'n at 6:21–7:1 (asserting Plaintiffs challenge is directed towards the

- 26 -

licensure requirement for preschools).)   That provision states, "No firm, partnership, association, or corporation shall operate, establish, manage, conduct, or maintain a child day care facility in this state without a current valid license[.]"  Cal. Health & Safety Code § 1596.80.  The Act's licensure provision is its lynchpin.  Without it, the Act and its implementing regulations' health and safety requirements and benchmarks, enforcement provisions, and procedural rights all fall by the wayside, for there can be no binding licensing scheme without a licensing requirement.  But Plaintiffs' own allegations do not support the expansive breadth of the Free Exercise Claim they purport to bring in their brief.  Rather, the Complaint reveals a much narrower Free Exercise challenge.  One that is directed towards a single substantive DSS regulation:  the religious services provision.  (*See* Compl. ¶¶ 95–98.)

A comparison of the allegations in the Complaint with the facts in *McMahon*, 696 F. Supp. at 518, elucidates the more targeted nature of Plaintiffs' Free Exercise Claim.  The *McMahon* plaintiffs, who operated a preschool with an expired license, claimed that not only did specific provisions of the Act and its implementing regulations—including a prior iteration of the religious services provision—interfere with their religious beliefs, *see id.* at 530–34, but also the Act's licensing requirement, in and of itself, was irreconcilable with their religious convictions, *see id.* at 524–25.  Specifically, the *McMahon* plaintiffs averred Cal. Health & Safety Code § 1596.80 required them to "demonstrate their acceptance of the authority of the [S]tate over Jesus Christ in the operation of the Church itself."  *Id.* at 524.  Such acceptance, the *McMahon* plaintiffs averred, would be antithetical to their faith. *Id.* at 524.  On these facts, the *McMahon* Court construed the free exercise claim before it as a challenge to the licensing requirement imposed by the Act, ultimately finding that, although Cal. Health & Safety Code § 1596.80 imposed a substantial burden upon the *McMahon* plaintiffs' religious expression, it nevertheless satisfied strict scrutiny review. *Id.* at 525–30.

Although Foothills, Grove, and Journey allege the Act does not contain an exemption from licensure specifically for houses of worship (Compl. ¶ 1), unlike the

*McMahon* plaintiffs, they do not allege a religious objection to licensure. They allege they hold faith-based beliefs that "family is a God-ordained unit and that fit parents are charged with authority to raise their small children and make decisions for them" and that it is their duty to minister to children. (*See id.* ¶¶ 26, 68–69.) Yet the Complaint fails even to attempt to articulate how these beliefs are at odds with the Act's licensure requirement at Cal. Health & Safety Code § 1596.80. In other words, Plaintiffs do not allege they must contravene a sincerely held religious belief to abide by the Act's requirement they attain a license from the DSS to operate a child day care facility. Instead, Plaintiffs merely allege they "do[] not want a preschool that operates at the pleasure of the State of California Department of Social Services through the State's licensing scheme." (*Id.* ¶ 37.) But "indignation is not an injury that confers standing to sue" under the Free Exercise Clause. *See Am. C.L. Union of Ill. V. City of St. Charles*, 794 F.2d 265, 274 (7th Cir. 1986). The tension between the Act's licensure regime and Plaintiffs' reasons for noncompliance therewith must be religious in nature. Anything less, and Plaintiffs cannot acquire standing to press a Free Exercise Claim that encompasses Cal. Health & Safety Code § 1596.80. *See Am. Legion*, 139 S. Ct. at 2100.

Plaintiffs' injury-in-fact allegations instead point to a narrower conflict: their religious obligation to minister to children, on the one hand (*see* Compl. ¶¶ 68–69), and the religious services provision, on the other hand, *see* Cal. Code Regs. tit. 22 § 101123(a)(5). Specifically, Plaintiffs allege they hold a faith-based commitment to administer mandatory religious education in the preschools they intend to establish. (*See* Compl. ¶ 97 ("[C]onsistent with thousands of years of Christian practice, the Church-Plaintiffs do not provide personal autonomy for children in their preschool ministries. The Church-Plaintiffs require personal autonomy for children in preschool ministries. The Church-Plaintiffs require participation in religious activities and religious services.").) However, Plaintiffs claim the religious services provision proscribes child day care facilities from instituting a mandatory religious curriculum. (*See id.* ¶¶ 96–97.)

- 28 -

22cv0950

The Court, therefore, examines whether Plaintiffs have standing to assert a pre-enforcement Free Exercise Claim aimed at the religious services provision.

### ii.     Plaintiffs Lack Standing to Bring a Pre-Enforcement Challenge

As set forth above, *see supra* Sec. IV.B.1, to acquire standing for a pre-enforcement challenge to government action, a plaintiff still must satisfy all three elements of standing: injury-in-fact, causation, and redressability.  *See, e.g.*, *Driehaus*, 573 U.S. at 158; *Babbitt*, 442 U.S. at 298; *Steffell v. Thompson*, 415 U.S. 452, 459 (1974).  But in a pre-enforcement challenge, the injury-in-fact element of standing takes on new meaning:  it requires allegations that the plaintiff "[(1)] has an intention to engage in a course of conduct arguably affected with a constitutional interest, [(2)] but proscribed by a statute, and [(3)] there exists a credible threat of prosecution thereunder." *Driehaus*, 583 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298).  These factors illuminate whether the injury-in-fact alleged is (1) concrete and particular to the plaintiff, and (2) is actual and imminent, as opposed to conjectural and hypothetical.  An evaluation of these factors reveals Plaintiffs fail to allege either of the prerequisite sub-elements to establish an injury-in-fact.

### a.     Course of Conduct

The first requirement for pre-enforcement standing is that Plaintiffs demonstrate they intend to engage in a course of conduct arguably protected by the Constitution.  *See Driehaus*, 573 U.S. at 159.  Plaintiffs allege they plan to open and operate preschools, which indisputably will be subject to the Act. (Compl. ¶¶ 1, 72.)  Moreover, Plaintiffs aver that it is their god-ordained mission to minister to children, and, therefore, plan to institute mandatory attendance at religious events and participation in religious activities. (*Id.* ¶ 69 ("Any preschool programs would be available only to parents that want to work cooperatively with the Church-Plaintiffs on religious services and activities.  The Church-Plaintiffs do not allow children or unwilling parents to exercise autonomy as it relates to religious services and activities.").)

22cv0950

Defendants do not contest Plaintiffs' blueprint to open parochial preschools with "biblically based teaching" is arguably protected by the Free Exercise Clause.  Instead, Defendants argue Grove and Journey's plan is too hypothetical to support standing because "[t]he Complaint contains no allegations [they] have taken any actual steps to open and operate a preschool."[9]  (Mot. at 8:5-7.)

This Court disagrees.  Beyond Grove and Journey's insistence they intend to open preschools, the Complaint contains sufficient factual allegations from which this Court can infer both Plaintiffs' plans are not mere wishful thinking:  they have ingredients in place to bring to fruition their object.  For example, the Complaint contains facts suggesting both Plaintiffs have potential admission bases for their preschools.  (Compl. ¶¶ 39 ("The Grove Church has a congregation that approximates 600 to 700 parishioners on any given Sunday, about 120 of whom are children."), 47–48 ("Prior to the COVID-19 outbreak, Journey had three services on Friday and Sunday averaging 1,200 to 1,500 in attendance. Approximately 20 percent of those in attendance are children.").)   Furthermore, the Complaint alleges Grove and Journey's ministries for children are familiar with educating and caring for their parishioners' children, albeit in settings that fall outside the scope of the Act.  (Id. ¶¶ 40 (alleging Grove holds Friday and Sunday School in classrooms on its premises), 42 (alleging Grove hosts summer and winter camps, as well as holiday evens and festivities), 52 (alleging Journey holds Sunday School and "various midweek events for different age groups" on its premises and hosts a summer camp).)  These allegations are sufficient at this early stage to satisfy this Court that Grove and Journey's envisaged preschools are not illusory, and that those Plaintiffs are not seeking to execute an end-run around standing requirements just to challenge a statute they view unfavorably, but to which their subjection is unlikely.

---

[9] Defendants do not lodge the same challenge against Foothills, presumably because Foothills previously operated a licensed preschool and infant care facility for years, until recently.  It is undisputed, however, Foothills—like Grove and Journey—currently does not operate a licensed or unlicensed child day care facility.

- 30 -

**b.     Proscribed by Law but
          Protected by the Constitution**

The second requirement is that Plaintiffs demonstrate the course of conduct in which they seek to engage is proscribed by statute or regulation, but protected by the Constitution. *See Driehaus*, 573 U.S. at 159.

Plaintiffs aver that, despite enjoying Free Exercise Clause protection, their plans to institute mandatory religious curriculum is forbidden by the religious services provision. (*See* Compl. ¶¶ 68–69, 95–98.)  That provision, Plaintiffs allege, requires them to "provide personal religious autonomy for children in their preschool ministries." (*Id.* ¶ 97.)  Yet, to reach this legal premise, Plaintiffs misinterpret the regulatory text of the religious services provision and overlook other provisions of the Act and its implementing regulation, which work in combination with one another to secure the very religious freedom Plaintiffs seek to vindicate.  That is, when examining the religious services provision within the greater context of the Act and its surrounding DSS' regulations pertaining to admissions, it is clear that regulation actually strikes the delicate balance of preserving religious institutions' right to implement faith-based curricula, while protecting parents' constitutional right to determine the religious upbringing and education of their children.  *See, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)

To demonstrate how, the Court begins with California Health & Safety Code § 1597.06(a), which explicitly forbids the DSS from reviewing "the content of educational or training programs" in determining whether to grant, revoke, or suspend a provider's license.  Cal. Health & Safety § 1597.06(a).  This provision reaffirms that the Act's scope is limited to health and safety considerations, and leaves ample room for religiously affiliated institutions to fold into their curricula religious elements.  *See id.*; *McMahon*, 696 F. Supp. at 521 (observing § 1597.06(a) leaves providers "free to teach, or to not teach, on any subject and in any manner it deems fit," and, as a consequence of this protection, "centers within the state run the gamut," including those that provide "intensive . . . religious training").

- 31 -

Moreover, the Act's regulations pertaining to admission policies enable parochial facilities to make religious curriculum *mandatory* for its enrollees. Cal. Code Regs. tit. 22 § 101218.1 conveys a provider with sweeping authority to develop admission policies that suit the needs of its facility's "individual program." *See* Cal. Code Regs. tit. 22 § 101218.1 ("In accordance with the child care center's individual program, Policies and needs, the licensee shall develop implement and maintain an admission procedure."). And a provider has near-absolute discretion to determine whether a child applicant "meets the child care center's admission criteria." *Id.* § 101218.1. All the Act requires is that a facility's admission policy be disclosed to prospective parents and guardians prior to enrollment. *Id.* Hence, a licensed parochial preschool may develop an admission policy that discloses religious instruction, activities, and services are part of the program's curriculum, without exception, and the preschool may exclude from enrollment children unwilling to abide.

The religious services provision gives teeth to the right to institute mandatory faith-based education bestowed upon licensed parochial schools by the Act and the DSS' admissions-related regulations. It does so by enabling "authorized guardians" to make decisions about religious events and activities on behalf of their children. Cal. Codes. Regs. tit. 22 § 101223(a)(5)(A). Indeed, while the religious services provision guarantees to all children enrolled in child day care facilities the right to "be free to attend religious services or participate in religious activities," it empowers a child's "authorized representatives" to decide on behalf of the child whether he or she shall participate in the religious component of a facility's training and educational program. *Id.* § 101223(a)(5)(A) ("Attendance at religious services in or outside the center shall be voluntary. The child's authorized representative shall make decisions about the child's attendance at religious services."). Thus, an authorized guardian may consent to a parochial preschool's admission policy of mandatory religious education as a condition of enrollment on behalf of his or her child. And while a child, at all times, retains the choice to be free to attend religious services and participate in religious activities as he or she so chooses, that choice being exercised by his or her authorized guardian, a licensed preschool

also remains free to exercise its compulsory admission policies as a bulwark against providing religious autonomy to its enrollees, so long as its religious orientation and mandatory curriculum was disclosed prior to the child's enrollment.

Hence, contrary to Plaintiffs' assertion the religious services provision operates like a ban on uniform, faith-based curriculum, it is actually a mechanism that secures that very religious freedom. Plaintiffs' plan to open and operate parochial preschools is completely consistent with the Act and its implementing regulations, including the religious services provision. *Cf. McMahon*, 696 F. Supp. at 533 ("As so interpreted and enforced, the religious services provision does not conflict with plaintiffs' religious beliefs . . . . [T]he Preschool need not in any manner alter or discard its mandatory religious curriculum believed necessary to promote evangelism and outreach.").[10]

Plaintiffs' failure to allege their plan to administer a uniform, mandatory religious curriculum is proscribed by the religious services provision dooms Plaintiffs' bid for standing. *Cf. Burns v. Warwick Valley Cent. Sch. Dist.*, 166 F. Supp. 2d 881, 891 (S.D.N.Y. 2001) (holding plaintiff who failed to allege governmental action "cross[ed] the constitutional threshold to cause plaintiffs injury in fact" lacked standing to pursue a claim under the Free Exercise Clause); *Delaney v. Baker*, 511 F. Supp. 3d 55, 69 (D. Mass. 2021) (finding plaintiff lacked injury-in-fact to sustain Free Exercise Claim where he failed to allege the State's COVID-19 occupancy limits applicable to places of worship actually

---

[10] Plaintiffs contest that *McMahon* is irrelevant to the instant action because that case "turned entirely on the specific facts from a bench trial rather than an interpretation of the regulation." (Opp'n at 13:15-19.) While it is true the *McMahon* Court's decision that the religious services provision did not interfere with the *McMahon* plaintiffs' free exercise rests upon both its interpretation of the provision itself *and* testimony from a DSS official concerning how the religious services provision is enforced in practice, Plaintiffs' argument overlooks that the substance of the DSS official's testimony in *McMahon* is reflected and codified in the DSS's implementing regulations in place today. *See* 696 F. Supp. at 533–35 (observing the DSS official testified: the "choice" to attend religious services "is exercised not by the young child, who is deemed without capacity to render such a choice, but by the parent"; "a religiously-affiliated preschool, desirous of a uniform religious orientation, may require the parent, as a condition to admittance of the child, to exercise this choice in accordance with the preschool's orientation"; and "[a] religiously-affiliated preschool may accomplish this objective simply by fully disclosing its religious orientation and mandatory curriculum to all parents prior to enrollment"). Thus, *McMahon* is still illuminating, despite the distinction in procedural posture between it and the instant case.

impeded his access to his parish church).   But even if Plaintiffs' interpretation of the religious services provision is correct (it is not), they still lack standing to bring the Free Exercise Claim at this time because they fail to allege any likelihood that provision will be adversely enforced against them.

### c.   Credible Threat of Enforcement

The third requirement is that Plaintiffs show a credible threat of enforcement of the challenged religious services provision. *See Driehaus*, 573 U.S. at 159.  The Ninth Circuit employs a "three factor inquiry to determine whether a threat of enforcement is genuine enough to confer an Article III injury":  (1) "whether the plaintiff has a 'concrete plan' to violate the law"; (2) "whether the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings'"; and (3) "whether there is a 'history of past prosecution or enforcement'" (the "*Thomas* factors").  *Tingley*, 47 F.4th at 1067 (quoting *Thomas*, 220 F.3d at 1139).  Assessing the Complaint's factual allegations through the lens of the *Thomas* factors, the Court concludes there does not exist any genuine threat the religious services provision will be adversely enforced against Plaintiffs.

Concrete Plan to Violate the Law:  As the Court previously opined, *see supra* Sec. IV.B.4.ii.b, the Court is not convinced Plaintiffs' plan to institute a uniform, mandatory curriculum violates the religious services provision.  For the reasons explained above, the Court interprets the religious services provision as *enabling* Plaintiffs to bring this plan to fruition.  In addition, Plaintiffs fail to make an adequate showing on the other *Thomas* factors.

Communication of a Specific Warning or Threat:  Far from threatening Plaintiffs with enforcement, Defendants aver Plaintiffs' plan to implement a mandatory religious curriculum at their yet-to-be-established preschools is "consistent with" the Act itself. (Reply at 8:23–9:19.)  Hence, Plaintiffs fail to demonstrate any communication by the agencies responsible for enforcing the Act that there exists a threat of enforcement or prosecution on the horizon.

22cv0950

<u>History of Past Prosecution or Enforcement</u>:  Plaintiffs do not cite a single instance in which the religious services provision has been enforced against a parochial child day care facility to enjoin its mandatory religious curriculum.  The absence of any historical exemplar in the Complaint is particularly notable, given Foothills alleges it previously operated a preschool with a mandatory religious curriculum for years until recently.  (*See* Compl. ¶¶ 15–17.)  Nor does this Court's own research disclose any instance in which the religious services provision has been enforced in the way in which Plaintiffs fear.  Indeed, based on *McMahon*, it appears to the Court that for more than 30 years it has been the position of the DSS that mandatory religious curriculum is entirely consistent with the Act.

From the absence of the *Thomas* factors, the Court finds Plaintiffs fail to allege an injury-in-fact derived from the religious services provision—or any other provision of the Act and its implementing regulations for that matter. Therefore, Plaintiffs lack standing to bring their pre-enforcement Free Exercise Claim.

### iii. Foothills' Prior Revocation of its License Does Not Confer Plaintiffs Standing

As an alternative basis for standing, Plaintiffs argue Foothills suffered an injury-in-fact when the DSS fined its preschool in 2021 and, then, revoked its license in 2022 for noncompliance with California's COVID-19 masking requirements.  (Opp'n at 4:2-4.) ("Here there can be little dispute that the application of the Act and regulatory scheme has injured Foothills and that injury is the result of the conduct of DSS.  Foothills has been fined and closed by DSS under the authority of the Act.").)[11]  But these allegations do not confer Foothills with standing to press its Free Exercise Claim for two reasons.

<u>First</u>, this theory of standing, again, is missing factual allegations that give rise to a Free Exercise injury.  Foothills does not allege it failed to comply with California's

---

[11] Plaintiffs aver Foothills' purported injury-in-fact is sufficient to confer Grove and Journey with standing, too.  (*Id.* at 4 n.8 ("Because Foothills clearly has standing, the Court need not go through the *Lujan* prongs for the other two plaintiffs" (citing, *inter alia*, *Bowsher v. Snyar*, 478 U.S. 714, 721 (1986))).)  Because the Court finds Foothills' alternative standing theory lacks merit, it need not address this contention.

COVID-19 masking requirements applicable to child day care facilities because it had a religious objection to adherence.  The Complaint contains no averment Foothills was forced to choose between its faith, on the one hand, and compliance with the DPS' COVID-19 orders, on the other hand.  Instead, Foothills alludes to the difficulties in ensuring young children remain masked throughout the day, and to the differing opinions among parents about the DPS' COVID-19 orders pertaining to face masks.  (*See* Compl. ¶ 18.)  Because the Complaint is bereft of any allegation allowing even the inference Foothills' injury was borne from the infringement of a sincerely held religious belief, the DSS' fines and revocation of Foothills' license cannot support Plaintiffs' Free Exercise Claim.  *See, e.g.*, *McGowan*, 366 U.S. at 429–30.

Second, the financial penalties imposed against Foothills by the DSS and the DSS' closure of Foothills' preschool cannot be redressed by the relief the Complaint seeks: prospective injunctive and declaratory remedies.  Indeed, as a general matter, "[n]either injunctive nor declaratory relief may be premised on past injury." *Schumacher v. Inslee*, 474 F. Supp. 3d 1172, 1175 (W.D. Wash. 2020) (citing, *inter alia*, *O'Shea v. Littleton*, 414 U.S. 488, 495–96); *see also Lyons*, 461 U.S. at 105.  An exception to this general proscription exists only where the plaintiff alleges "a sufficient likelihood that [it] will again be wronged in a similar way." *Lyons*, 461 U.S. at 111.

While Foothills' alleged injury might entitle it to seek damages, Foothills must demonstrate there is a "sufficient likelihood" it will endure in the foreseeable future a similar injury:  enforcement action for failure to abide by the DPH's COVID-19 masking orders applicable to child health care centers.  But Foothills cannot show this, for, as Defendants point out, in March 2022 DPH terminated the COVID-19 masking orders Foothills violated.  (*See* Masking Guidance at 1.)  The Complaint does not allege circumstances suggesting DPH will reinstate these orders.  For this reason, Foothills fails to show the injunctive and declaratory relief sought will redress its alleged injury and, therefore, Foothills falls short of establishing standing.

1   Accordingly, the Court finds Plaintiffs lack standing to assert their Free Exercise

2   Claim.  Therefore, it **GRANTS** Defendants' Motion to the extent it seeks dismissal of the

3   Free Exercise Claim pursuant to Rule 12(b)(1).  Such dismissal must be without prejudice.

4   *See Tosco Corp. v. Cmtys. for a Better Env't*, 236 F.3d 495, 502 (9th Cir. 2001).

5       **C.    Plaintiffs' Privileges or Immunities Claim is Not Cognizable**

6   Plaintiffs' second claim arises under the Privileges or Immunities Clause of the

7   Fourteenth Amendment.  That Clause provides, "No State shall make or enforce any law

8   which shall abridge the privileges or immunities of the citizens of the United States."  U.S.

9   Const. Amend. XIV, § 1.  Plaintiffs contend the Act violates the Privileges or Immunities

10  Clause because it conditions licensure to operate a child day care facility in California upon

11  applicants waiving rights guaranteed to them under the Fourth, Fifth, Sixth, and Seventh

12  Amendments.   (Compl. ¶¶ 99–110.)   In response, Defendants argue the Privilege or

13  Immunities Clause does not provide Plaintiffs a vehicle to challenge the Act based upon

14  their unconstitutional-conditions theory.[12]  (Mot. at 1:2-7.)  This Court agrees.

15  Since it decided the *Slaughter-House Cases* nearly 150 years ago, the Supreme Court

16  has espoused the view in its decisions that the Privileges or Immunities Clause is not

17  "intended as a protection to the citizen of a State against the legislative power of his [or

18  her] own State[.]"  83 U.S. 36. 74–75 (1872); *see also Toomer v. Witsell*, 334 U.S. 385,

19  395 (1948); *Merrifield v. Lockyer*, 547 F.3d 978, 982–83 (9th Cir. 2008) ("[T]he Supreme

20

21  _____

22  [12] It bears noting Defendants do not challenge Plaintiffs' standing with respect to their Privileges
or Immunities Claim specifically.  Nevertheless, the Court is satisfied the Complaint contains facts to

23  support subject matter jurisdiction.  *See Driehaus*, 583 U.S. at 159 (delineating standing requirements for
a pre-enforcement challenge)

24  As mentioned above, Plaintiffs allege with adequate certainty their plan to open preschools.  *See
supra* Sec. IV.B.4.i.  They further allege an inherent conflict between their constitutional rights secured

25  by the Fourth, Fifth, Sixth, and Seventh Amendments, and the provisions of the Act and DSS regulations
that give the DSS broad authority to inspect and investigate licensed child day care facilities to ensure

26  compliance, even when it has no basis to believe a violation is present. (*See* Compl. ¶¶ 101–07.)  Finally,
Plaintiffs' allegations concerning the DSS' investigation of Foothills' now-defunct preschool and infant

27  care center, and the fact Cal. Health & Safety Code § 1597.091(d) requires inspection at least once every
three years, are sufficient at this stage to show there exists a "credible threat" DSS will deploy its authority

28  under the challenged oversight and compliance provisions against Plaintiffs. (*See id.* ¶¶ 17–22.)

- 37 -

Court drew tight boundaries around the Privileges or Immunities Clause of the Fourteenth Amendment in the *Slaughter-House Cases*[.]").  The Supreme Court has, instead, opined the Privileges or Immunities Clause "secures only those rights which 'own their existence to the Federal government, its National character, its Constitution, or its laws.'" *Merrifield*, 547 F.3d at 983 (quoting *Slaughter-House Cases*, 83 U.S. at 79).  As articulated in *Toomer*, the Privileges or Immunities Clause "was designed to insure a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy."  334 U.S. at 395.  Yet Plaintiffs, here, seek to deploy the Privileges or Immunities Clause precisely in a manner clearly inconsistent with the *Slaughter-House Cases*—as a mechanism to strike down on constitutional grounds California's legislative scheme to regulate child day care facilities.  The *Slaughter-House Cases* forbid Plaintiffs from doing so.

Plaintiffs contend the *Slaughter-House Cases* will likely be overturned.    (Opp'n at 18:1-13.)  They point to a concurrence in *United States v. Vaello-Madero*, 142 S. Ct. 1539, 1550–51 (2022), in which Justice Thomas, joined by Justice Gorsuch, appears to endorse a much broader view of the Privileges or Immunities Clause that is espoused in the dissent of Justice Field in the *Slaughter-House Case*.  (Opp'n at 18:7–13 ("The better view [of the Privileges or Immunities Clause] is that "[t]he fundamental rights, privileges, and immunities which belong to him as a free man and a free citizen, now belong to him as a citizen of the United States, and are not dependent upon his citizenship of any State." (quoting *Slaughter-House Case*, 83 U.S. at 95 (Fields, J., dissenting))).)   Under this interpretation of the Privileges or Immunities Clause, Plaintiffs contend their unconstitutional conditions theory is viable.

But whichever direction the proverbial winds are blowing, the *Slaughter-House Cases* remain good law. *See Merrifield*, 547 F.3d at 984. (observing that, "although many scholars have argued for overruling the *Slaughter-House Cases* in toto," courts remain bound to it).  The Supreme Court has "qualif[ied] the bar on Privileges or Immunities claims against 'the power of the State governments over the rights of [their] own citizens'" only once, in *Saenz v. Roe*, 526 U.S. 489 (1999).  *Merrifield*, at 983–84.  In *Saenz*, the

22cv0950

Supreme Court recognized a limited federal right to travel: the right of travelers who elect to become permanent residents of another State to be treated like other citizens of that State. 526 U.S. at 500. Because Plaintiffs' Privileges or Immunities Claim does not invoke the right to travel, it does not fall within the ambit of *Saenz*'s limited abrogation of the *Slaughter-House Cases*.

Thus, Plaintiffs' Privileges or Immunities Claim fails for lack of cognizable theory. *See Johnson v. Riverside Healthcare Sys. LP*, 534 F.3d at 1121. The Court, therefore, **GRANTS** Defendants' Motion to the extent it seeks dismissal of the Privileges or Immunities Claim under Rule 12(b)(6). Dismissal is **WITHOUT PREJUDICE** to Plaintiffs raising their unconstitutional conditions claim under a separate and distinct legal theory that is not foreclosed by Supreme Court precedent.

## V. CONCLUSION

For the reasons sated above, the Court **GRANTS** Defendants' Motion to dismiss Plaintiffs' Free Exercise Claim pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and Plaintiffs' Privileges or Immunities Claim for lack of cognizable legal theory under Ruel 12(b)(6). That dismissal is **WITHOUT PREJUDICE** to Plaintiffs filing an amended pleading that resolves the deficiencies observed herein. If Plaintiffs wish to do so, they must file an Amended Complaint **on or before July 14, 2023**.

**IT IS SO ORDERED.**

**DATED: June 15, 2023**

**Hon. Cynthia Bashant**
**United States District Judge**